[Cite as *Privett v. QSL-Milford, L.L.C.*, 2013-Ohio-4129.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

DAVID B. PRIVETT, et al.,                  :

    Plaintiffs-Appellants,               :         CASE NO.   CA2013-04-025

                                  :              O P I N I O N
  - vs -                                                                9/23/2013

                                    :

QSL-MILFORD, LLC, et al.,                  :

    Defendants-Appellees.                :

CIVIL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2011 CVC 01913

The Moore Law Firm, Donald C. Moore, Jr., Daniel N. Moore, Derrick A. Wyatt, 1060 Nimitzview Drive, Suite 200, Cincinnati, Ohio 45230, for plaintiffs-appellants, David B., Brenda J., Stephen and Austin Privett

Mularski, Bonham, Dittmer & Phillips, LLC, Lynne K. Schoenling, 107 W. Johnstown Road, Gahanna, Ohio 43230, for defendant-appellee, QSL-Milford d.b.a. Quaker Steak & Lube

Kreiner & Peters Co., L.P.A., Todd W. Smith, 6047 Frantz Road, Suite 203, Dublin, Ohio 43017-3387, for defendant-appellee, United Health Care Ins. Co.

    **PIPER, J.**

    {¶ 1}   Plaintiffs-appellants, David, Brenda, Stephen and Austin Privett, appeal a

decision of the Clermont County Court of Common Pleas, granting summary judgment in

favor of defendant-appellee, QSL-Milford dba Quaker Steak & Lube (QSL).[1]

{¶ 2} QSL operates a Quaker Steak & Lube restaurant in Milford, Ohio, that promotes "Bike Night" on Wednesdays during the summer months. On any given Bike Night, QSL invites a band to play live music in the parking lot, as well as various venders who tailor their businesses to motorcycle enthusiasts. In addition to the three bar locations within the restaurant and on the outside patio, patrons also have access to alcohol served in the parking lot. This "beer booth" serves beer in 24-ounce plastic cups and only accepts cash payments.

{¶ 3} On the night of August 17, 2011, Jason Carpenter drove his motorcycle from work to the Quaker Steak & Lube restaurant where QSL employees, including the bartender Felicia Fields, served him between five to seven beers over a span of approximately three hours and 15 minutes. Carpenter also consumed food at the restaurant, including 12 boneless wings and french fries. Carpenter's friends and co-workers, Matt Swartz and Fernando Sanchez, were at the restaurant with Carpenter, and also consumed alcohol with him. After drinking multiple beers inside, Carpenter and Swartz proceeded to the parking lot where it is possible that they consumed an additional one or two beers from the beer booth. Carpenter and Swartz then walked around the parking lot, looking at other motorcycles for approximately 30 to 45 minutes, before they left the restaurant.

{¶ 4} Within a half-mile from the parking lot, Carpenter lost control of his motorcycle, struck a guardrail on the opposite side of the road, and was propelled over an embankment. Carpenter's motorcycle continued down the road, and spun directly into the path of David Privett, who was riding his motorcycle to the restaurant for Bike Night. Privett sustained serious injuries including a fractured pelvis, broken ribs, a fractured wrist and a fractured

---

1. Pursuant to Loc.R. 6(A), we sua sponte remove this case from the accelerated calendar and place it on the regular calendar for purposes of issuing this opinion.

femur. Carpenter died as a result of his injuries. At the time of his death, Carpenter's blood alcohol level was .169.

{¶ 5} Privett, his wife Brenda, and their two sons, Austin and Stephen, filed suit against QSL, alleging that QSL violated Ohio's Dram Shop Act and was liable for Privett's injuries. QSL filed a motion for summary judgment, and the trial court granted it. The Privetts now appeal the trial court's decision raising the following assignment of error.

{¶ 6} THE TRIAL COURT ERRED IN GRANTING THE MOTION FOR SUMMARY JUDGMENT OF DEFENDANT-APPELLEE QSL-MILFORD, LLC.

{¶ 7} The Privetts argue in their assignment of error that the trial court erred in granting summary judgment to QSL.

{¶ 8} This court's review of a trial court's ruling on a summary judgment motion is de novo. *Broadnax v. Greene Credit Serv.*, 118 Ohio App.3d 881, 887 (2d Dist.1997). Civ.R.56 sets forth the summary judgment standard and requires that (1) there be no genuine issues of material fact to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to only one conclusion being adverse to the nonmoving party. *Slowey v. Midland Acres, Inc.*, 12th Dist. Fayette No. CA2007-08-030, 2008-Ohio-3077, ¶ 8. The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64 (1978).

{¶ 9} The nonmoving party "may not rest on the mere allegations of his pleading, but his response, by affidavit or as otherwise provided in Civ.R. 56, must set forth specific facts showing the existence of a genuine triable issue." *Mootispaw v. Eckstein,* 76 Ohio St.3d 383, 385 (1996). A dispute of fact can be considered "material" if it affects the outcome of the litigation. *Myers v. Jamar Enterprises*, 12th Dist. Clermont No. CA2001-06-056, 2001 WL 1567352, *2 (Dec. 10, 2001). Not all disputes of fact create a genuine issue. Instead, a dispute of fact can be considered "genuine" if it is supported by substantial evidence that

exceeds the allegations in the complaint. *Id.*

**{¶ 10}** According to Ohio's Dram Shop Act, as codified in R.C. 4399.18,

> a person has a cause of action against a permit holder or an employee of a permit holder for personal injury, death, or property damage caused by the negligent actions of an intoxicated person occurring off the premises or away from a parking lot under the permit holder's control only when both of the following can be shown by a preponderance of the evidence: (A) The permit holder or an employee of the permit holder knowingly sold an intoxicating beverage to * * * (1) A noticeably intoxicated person in violation of division (B) of section 4301.22 of the Revised Code * * * [and] (B) The person's intoxication proximately caused the personal injury, death, or property damage.

According to R.C. 4301.22(B), "no permit holder and no agent or employee of a permit holder shall sell or furnish beer or intoxicating liquor to an intoxicated person."

**{¶ 11}** The Ohio Supreme Court examined Ohio's Dram Shop Act and found that "actual knowledge of intoxication is a necessary component in fashioning a justiciable claim for relief under R.C. 4301.22(B). * * * *Constructive knowledge will not suffice.* It has been observed that to hold otherwise would subject vendors of intoxicating beverages to ruinous liability every time they serve an alcoholic beverage." (Emphasis added and internal citations omitted.) *Gressman v. McClain*, 40 Ohio St.3d 359, 363 (1988). In explaining actual knowledge, the court stated,

> knowledge of a patron's intoxication may be obtained from many sources and in many ways, and is furnished or obtained by a variety of facts and circumstances. Generally speaking, a person has knowledge of an existing condition when his relation to it, his association with it, his control over it, or his direction of it are such as to give him actual personal information concerning it.

*Id.*

**{¶ 12}** After reviewing the record, and construing all facts in a light most favorable to the Privetts, summary judgment was appropriate because there are no genuine issues of

material fact to be litigated regarding whether QSL knowingly served a noticeably-intoxicated Carpenter or had "actual knowledge" Carpenter was intoxicated *at the time he was served* intoxicating beverages.

{¶ 13} Within his deposition, Matthew Swartz testified to the events on the evening of the accident. Swartz testified that he, Carpenter, and Sanchez all worked for the same company and that the three decided to meet at Quaker Steak & Lube after work. Swartz and Carpenter arrived at the restaurant around 3:30-3:40, and Sanchez joined them later. Swartz testified that he and Carpenter eventually left the restaurant around 8:00 p.m., and that during the time they were there, they consumed beer. Swartz was unable to recall the exact amount of beers he consumed, but stated that it was possible that he and Carpenter consumed beer at both the patio bar as well as the beer booth in the parking lot. After drinking at the patio bar, but before leaving, Swartz and Carpenter walked around the parking lot for approximately 30 to 45 minutes looking at the motorcycles and talking to the other patrons.

{¶ 14} When Swartz was asked whether Carpenter was drunk that night, Swartz replied, "not that I know of." Swartz later testified that he "couldn't tell" whether Carpenter was intoxicated, and that Carpenter was not stumbling when walking, was not slurring his words, and did not have any facial features indicating that he was tired. Swartz also testified that Carpenter was not loud or belligerent at any time while he was in Carpenter's presence. When asked "was there ever a time at any point while you were at Quaker Steak that night that you observed Jason Carpenter and thought that he was intoxicated," Swartz replied, "no."

{¶ 15} Fernando Sanchez was also deposed, and testified that he came to the restaurant after Swartz and Carpenter had already arrived, and joined them in drinking beers at the patio bar. Sanchez testified that he had approximately five beers, and that he,

Carpenter, and Swartz were having a good time at the restaurant that night. Sanchez stated that the men talked about their personal lives, and that the three were acting friendly toward one another and more casual than they may have acted at work. Sanchez testified that the three men discussed being "buzzed," but stated that he was unaware if the bartender necessarily heard them.

{¶ 16} Throughout his deposition, Sanchez stated his belief that Carpenter and Swartz were both intoxicated on the night of the accident, and that he, himself, had been afraid of getting a DUI that night driving home. Sanchez also testified that he listened to Carpenter tell a story, and that Carpenter slurred his speech, spoke softer and slower than usual, and became emotional when discussing his wife. Sanchez also testified that if he knew that Carpenter was riding a motorcycle that night, he would not have let Carpenter drive home.

{¶ 17} While the Privetts assert that Sanchez's testimony demonstrates that QSL would have known that Carpenter was intoxicated when they served him, nowhere in Sanchez's deposition does he testify to anything that would have given QSL actual knowledge that Carpenter was intoxicated at the time he was served. Instead, Sanchez testified that Carpenter was "very respectful" that night, he did not see Carpenter stumble at all, that Carpenter had "normal" and "pleasant" conversations with others, Carpenter's eyes did not become red or bloodshot throughout the night, Carpenter did not appear tired, Carpenter never spilled his drink, Carpenter never fell down or dropped anything, and that Carpenter never showed anger or engaged in excessive cursing. The fact that Sanchez believed Carpenter to be drunk is insufficient to establish that QSL had actual knowledge that Carpenter was intoxicated and served him anyway.

{¶ 18} The law does not permit Sanchez's belief as to Carpenter's intoxication to be imputed to QSL. *See Caplinger v. Korrzan Restaurant Mgt., Inc.*, 12th Dist. Butler No. CA2011-06-099, 2011-Ohio-6020, ¶ 19 (noting that the "Ohio Supreme Court has specifically

stated that constructive knowledge [i.e. arguments of what someone should have known], whether it is based on direct or circumstantial evidence, *will not suffice* to demonstrate a claim under Ohio's Dram Shop Act"). (Emphasis sic.) Despite Sanchez's personal belief that Carpenter was intoxicated, the record demonstrates that QSL had no actual knowledge that Carpenter was intoxicated or that its employees knowingly served a noticeably-intoxicated Carpenter.

{¶ 19} Felicia Fields was deposed, and testified that she served Carpenter, Sanchez, and Swartz on the night of the accident. Fields, who at the time of her deposition was employed as a server and bartender by QSL, testified that she was trained to monitor patrons with respect to alcohol consumption. Fields testified that as part of her training, she was taught to look for signs of intoxication, such as a flushed face, an increased volume of speech, the patron talking more than before, slurred speech, as well as how the patron is walking. Fields also testified to being aware of how many drinks a patron consumed within a given amount of time, and the need to further observe the patron for other signs of intoxication. During her testimony, Fields stated that she did not see any signs that would have indicated that Carpenter was becoming intoxicated or was intoxicated when she served him. Fields also testified that Carpenter was very respectful on the night she served him, and that she was not so busy that evening that she could not observe Carpenter for signs of intoxication.[2]

---

2. The Privetts argue that Carpenter was not being respectful on the night of the accident, and point to a portion of Fields' testimony wherein she recalled that Carpenter and Swartz sang "La Cucaracha" to Sanchez. The Privetts argue that Carpenter was "making fun of [Sanchez] for his Mexican heritage," which the Privetts argue would show that Carpenter was visibly intoxicated. However, Fields testified that the singing was "in good fun" and that all three were having fun during the singing. Sanchez also testified that Carpenter was "very respectful" on the night of the accident, and never testified that Carpenter was being disrespectful to him or his heritage on the night of the accident. When asked about Carpenter singing "La Cucaracha," Sanchez testified that they were laughing, having a "good time." Sanchez reiterated again that Carpenter was "being respectful all this time." Therefore, the record is clear that Sanchez did not feel that Carpenter was being disrespectful to him, or making fun of his heritage as the Privetts assert.

{¶ 20} Several other QSL employees were deposed; however, not one testified to having any actual knowledge that Carpenter was noticeably intoxicated when he was served. In fact, most of the other employees testified that they had not served Carpenter that night, or were unable to say for sure whether they had even served Carpenter. These employees included Michael Tringelof, the manager of the patio bar and outside dining area; Megan Freeman, another bartender who was working on the evening of the accident; James Mills, QSL's Vice President of Operations; Kathleen Donahoe, the general manager of the restaurant; Sean Dever, a bartender who worked on the night of the accident; R. Thomas Rogers, who worked in the beer booth in the parking lot on the night of the accident; Gary Stansbury, a bar manager; Stephanie Evans, a waitress and bartender who worked at the restaurant on the night of the accident; Timothy Hecktor, another worker at the beer booth in the parking lot; and Michael Melton, who managed the inside portion of the restaurant. Not a single one of these QSL employees testified to seeing Carpenter in any state of intoxication, let alone serving him alcohol while he was visibly intoxicated.

{¶ 21} In an effort to create a genuine issue of material fact, the Privetts claim that the testimony from Sanchez is sufficient to raise genuine issues of material fact as to whether QSL had actual knowledge of Carpenter's intoxicated state. However, we have already established that Sanchez's knowledge cannot be imputed to QSL where the record does not otherwise indicate that QSL had actual knowledge that Carpenter was noticeably intoxicated but chose to serve him anyway.

{¶ 22} In addition to Sanchez's testimony, the Privetts also point to the deposition testimony from Dr. Alfred Staubus in which he discussed pharmacokinetic calculations regarding to what degree Carpenter was intoxicated at approximate times during the night of the accident. Dr. Staubus estimated that based upon the level of alcohol in Carpenter's blood at the time of his death, Carpenter's blood alcohol level at approximately 6:45 p.m. that

night would have been between .111 to .127. In Dr. Staubus' estimation, a person with a blood alcohol content level between .111 to .127 would likely exhibit signs of being within the "excitement stage of alcoholic influence." According to Dr. Staubus, some of the symptoms of the excitement state of alcoholic influence include: emotional instability, decreased inhibitions, loss of critical judgment, impairment of memory and comprehension, decreased sensory response, increased reaction time, and some muscular incoordination. The record, however, does not contain any evidence that QSL saw Carpenter exhibit any of these symptoms at the time he was served.

{¶ 23} The testimony regarding calculations and the likelihood of exhibiting signs of alcoholic influence does not establish that QSL had actual knowledge that Carpenter was intoxicated yet served him anyway. "The mere fact that [a person's] blood alcohol content was in excess of the legal limit when tested after the accident, does not lead one to conclude, without additional evidence, that [an establishment] knowingly served alcohol to a visibly intoxicated person in violation of R.C. 4399.18." *Rockwell v. Ullom*, 8th Dist. Cuyahoga No. 73961, 1998 WL 563967, *6 (1998). The *Rockwell* court affirmed the trial court's grant of summary judgment where the tortfeasor's blood alcohol content was .169 but the appellant failed to produce evidence that the servers had actual knowledge that he was visibly intoxicated at the time of service.

{¶ 24} After reviewing the record, we find that Sanchez's testimony and the calculations by Dr. Staubus merely offer inferences that Carpenter was intoxicated at the time he was at the restaurant. However, such testimony fails to demonstrate that Fields, or any other QSL employee had actual knowledge that Carpenter was noticeably intoxicated at the time he was served. A review of the record indicates that even when construing the evidence in a light most favorable to the Privetts, the compilation of inferences creates a suggestion of constructive knowledge rather than actual knowledge, which is insufficient to maintain an

action pursuant to Ohio's Dram Shop Act. As such, the Privetts' assignment of error is overruled.

{¶ 25} Judgment affirmed.

M. POWELL, J., concurs.

RINGLAND, P.J., concurs separately.

**RINGLAND, P.J., concurring separately.**

{¶ 26} I concur with the judgment of the majority. However, I write separately to address the standard required to prove that a permit holder or employee of the permit holder had knowledge that a patron was intoxicated.

{¶ 27} I cannot disagree with the majority's legal analysis of Ohio case law that requires a permit holder or employee of the permit holder to have actual knowledge of intoxication. However, I must note that by forbidding constructive knowledge as a means of proving that a permit holder or its employee knowingly sold an intoxicating beverage to an intoxicated person, the burden for proving knowledge has been rendered entirely unworkable.

{¶ 28} Were proof of constructive knowledge sufficient, the present case may have survived the motion for summary judgment. Sanchez testified that the men discussed being buzzed, that Carpenter was intoxicated, slurred his speech, spoke softer and slower than usual and was emotional when discussing his wife. Sanchez was able to observe enough evidence of Carpenter's intoxication to state that he would not have let Carpenter drive home had he known he was driving a motorcycle. In addition, Dr. Staubus' testimony regarding Carpenter's blood alcohol content level and the correlating symptoms he would likely be exhibiting provided additional evidence that QSL had constructive knowledge of Carpenter's

intoxication. This evidence would likely have created a material issue of fact as to whether QSL had such knowledge.

{¶ 29} Instead, we are left with a standard that essentially requires offenders to openly admit that they knew they were serving an intoxicating beverage to a noticeably intoxicated person. Absent such an admission, it appears there can be no question of fact to allow the claim to proceed to trial.

{¶ 30} Therefore, while I accept that we are constrained to the actual knowledge standard by stare decisis and I thus concur with the majority, I am concerned that such an unworkable standard renders Ohio's Dram Shop Act toothless.